UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT HUIZENGA,

      Plaintiff,                             Case No. 16-cv-12001

v.                                    Hon. Matthew F. Leitman

JOELLE GWYNN *et al.,*

      Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANT
## N.Y.P. HOLDINGS' MOTION TO DISMISS (ECF #14)

In 2016, the *New York Post* (the "Post"), a New York-based daily newspaper, published three articles about *The Biggest Loser*, a reality-television program on which contestants compete to lose weight.   The articles included statements about Plaintiff Robert Huizenga, M.D. ("Dr. Huizenga"), a medical consultant to the show.   In this action, Dr. Huizenga brings libel and business interference claims against the Post based upon the statements it published about him. (*See* Compl., ECF #1.)

The Post has filed a motion to dismiss for lack of personal jurisdiction (the "Motion to Dismiss"). (*See* ECF #14.)   Because the assertion of personal jurisdiction over the Post would be unreasonable – and would "offend traditional notions of fair play and substantial justice," *Int'l Shoe Co. v. Washington*, 326 U.S.

310, 316 (1945) – the Court **GRANTS** the Motion to Dismiss and **DISMISSES** the claims against the Post without prejudice.

## I

## A

Dr. Huizenga is a licensed physician who lives in Los Angeles, California. (*See* Compl. at ¶1, ECF #1 at 3, Pg. ID 3.)  For many years, he has practiced medicine and acted as a medical consultant in southern California.  He is the former team physician for the Los Angeles Raiders professional football team; has served as a "writer, correspondent, advisor, and doctor on numerous TV shows and movies," including shows produced in southern California[1]; and he "runs The Clinic by Dr. H, a state of the art, multi-disciplinary fat loss facility in [s]outhern California." (*Id.* at ¶¶13, 16, 18, ECF #1 at 5-7, Pg. ID 5-7.)

Defendant N.Y.P. Holdings, Inc. publishes and does business as the Post. (*See id.* at ¶3, ECF #1 at 3, Pg. ID 3.)  The Post has its primary newsroom in New York and is published there. (*See* Declaration of Michael Racano ("Racano") at ¶4, ECF #14-2 at 3, Pg. ID 119.)

The Post "covers a mix of local (*i.e.*, New-York focused) and national stories, including general news, business, culture, and sports stories that appeal to

---

[1] Dr. Huizenga has consulted on numerous television programs including *Inside the Vault*, a program on Los Angeles television station KTLA, *Thinervention*, *Shedding For The Wedding*, *Extreme Makeover*, and *American Gladiators*. (*See* Compl. at ¶16, ECF #1 at 6, Pg. ID 6.)

the Post's primarily New York-based readership." (*Id.* at ¶7, ECF #14-2 at 3, Pg. ID 119.)  The Post's New-York focused coverage includes articles about, among other things,

> the city, county and state governments of New York. Coverage of crime in the Post focuses almost entirely on crime in the New York City area, including a page called 'NYPD Daily Blotter.'  Culture reviews in the Post typically cover New York cultural offerings (such as restaurants, theater, or concerts).  Coverage of real estate (both commercial and residential) focuses on the New York metropolitan area.  The weather coverage in the Post (including the daily temperature and weather forecast on the 'ear' of the front page of the paper) focuses on New York-area weather.  The TV listings in the Post list the New York affiliates of the various broadcast networks.  The sports section of the Post (for which the motto is 'The Best Sports In Town') focuses in particular on New York metropolitan area sports teams, including professional, college and high school teams.

(*Id.* at ¶7, ECF #14-2 at 2-3, Pg. ID 119-20.)

## B

The Post publishes a daily print edition and a digital edition. (*See id.* at ¶3, ECF #14-2 at 2, Pg. ID 118.)  Readers may purchase the print edition in one of three ways.  First, readers in certain limited geographic areas such as New York, Los Angeles, and Washington D.C., may purchase the print edition at retail locations. (*See id.* at ¶9, ECF #14-2 at 4-5, Pg. ID 120-21.)  Second, readers who live in an area where the print edition is sold at retail locations may sign-up for daily home delivery. (*See id.* at ¶¶ 9, 11, ECF #14-2 at 4-5, Pg. ID 120-21.)

3

Finally, readers anywhere in the United States may obtain the print edition through mail delivery. (*See id.* at ¶¶ 14-15, ECF #14-2 at 5-6, Pg. ID 121-22.)  "Unlike ordinary home delivery, U.S. Mail subscribers do not receive the paper the same day it is published on newsstands, but rather receive the paper days later in the U.S. Mail." (*Id.* at ¶14, ECF #14-2 at 5, Pg. ID 121.)  "U.S. Mail subscriptions [to the Post] may not be purchased directly through the [Post].  Instead, individuals must contact [a] third party fulfillment agent with whom the [Post] contracts for that purpose via [a] telephone number provided on the Post's website (and in the newspaper itself)." (*Id.* at ¶14, ECF #14-2 at 5-6, Pg. ID 121-22.)

The Post's digital edition is available on "several tablet computer and e-reader platforms," including the Apple iPad and the Amazon Kindle Fire. (*Id.* at ¶22, ECF 14-2 at 7, Pg. ID 123.)  Readers who subscribe to the digital edition do not subscribe through the Post.  Instead, "customers place orders to and directly pay" third party vendors, "who then remit a portion of those fees to [the Post]." (*Id.* at ¶23, ECF #14-2 at 7, Pg. ID 123.)  "For example, a customer would order the Apple iPad Digital Replica edition of the Post through the Apple App Store and directly pay Apple by providing a valid credit card number and billing zip code to Apple.  Apple would [then] remit a portion of that fee to [the Post]." (*Id.* at ¶23, ECF #14-2 at 7-8, Pg. ID 123-24.)  "Customers may also purchase Digital Subscriptions through a service called PressReader … which offers subscriptions

4

to digital replicas of many publications, including the Post, which may be then viewed through PressReader's 'app' on various platforms or printed out on paper." (*Id.*)

The Post also operates a website. The content of that site "heavily overlaps with, but is not always identical to, what is included in the Post newspaper." (*Id.* at ¶43, ECF #14-2 at 14, Pg. ID 130.) The website content "is available free of charge to any Internet user, without any requirement of the creation of a profile or payment of a subscription fee." (*Id.* at ¶41, ECF #14-2 at 13, Pg. ID 129.) The content can also be accessed "through a smartphone app" which offers "identical" content to the Post's website. (*Id.* at ¶42, ECF #14-2 at 13, Pg. ID 129.)

The Post's website contains a link that allows visitors to subscribe to home delivery of the paper (where such delivery is available). (*See id.* at ¶12, ECF #14-2 at 5, Pg. ID 121.) The website also contains a link to the "NYP Store" where readers can purchase "merchandise related to the Post," such as t-shirts and coffee mugs with the Post's logo. (*Id.* at ¶46, ECF #14-2 at 15, Pg. ID 131.) Finally, visitors to the website may sign up "to receive one of four different email newsletters" that the Post publishes and makes available free of charge. (*Id.* at ¶47, ECF #14-2 at 15, Pg. ID 131.) The only information the Post requires from readers who sign up for an email newsletter is a valid email address. (*See id.*) The Post

"does not collect information about the residence of readers who sign up for email newsletters." (*Id.*)

**C**

The print edition of the Post is not distributed for sale at retail locations in the State of Michigan. (*See id.* at ¶10, ECF #14-2 at 5, Pg. ID 121.)  Nor can readers in Michigan subscribe to home delivery of the print edition. (*See id.* at ¶13, ECF #14-2 at 5, Pg. ID 121.)  Because the Post does not offer home delivery of its print edition in Michigan, "[i]f a reader in Michigan attempted to order home delivery through the Post's website, the site would state that 'Paper delivery is not available in your area.'" (*Id.*)

Michigan residents who wish to subscribe to the Post have only two options: they may sign up for mail delivery of the print edition or purchase the digital edition through a third party vendor.  Only ten Michigan residents subscribe to mail delivery of the Post's print edition, and the Post estimates that 227 Michigan residents subscribe to the digital edition (through various third-party vendors). (*See id.* at ¶¶ 20, 38, ECF #14-2 at 7, 12, Pg. ID 123, 128.)

Readers of the Post in Michigan may also visit the Post's website.  The Post approximates that for the months of April, May, and June 2016 (the time period relevant here), about 2.9% (or 771,400) of the visitors to its website were from the State of Michigan, and these visitors accounted for 1.8% (or 2,700,000) of its total

6

page views during that time period. (*See* ECF #18-9 at 3, Pg. ID 253.)  And while, as noted above, visitors to the website may purchase Post-related products, "there has only ever been one sale of an item through the [NYP Store] to a Michigan resident, which took place in 2013." (Racano Decl. at ¶46, ECF #14-2 at 15, Pg. ID 131; emphasis removed.)  Finally, approximately 1.6-percent of the people who "open[]" the Post's email newsletters are located in Michigan. (ECF #18-9 at 3, Pg. ID 253.)

## D

*The Biggest Loser* is a reality-television show on which contestants compete to lose weight under the supervision of various doctors and celebrity trainers.  The show is "produced and filmed in California, and ... contestants [on the show] live on a 'ranch' in California during production of the show." (Maureen Callahan Decl. at ¶11, ECF #14-3 at 4-5, Pg. ID 138-39.)  Dr. Huizenga acts as a medical consultant on the program. (*See* Compl. at ¶16, ECF #1 at 6, Pg. ID 6.)

In 2016, the Post began investigating the *The Biggest Loser*.  As part of the investigation, Post reporter Maureen Callahan ("Callahan") contacted six former *Biggest Loser* contestants from across the country, including Michigan resident Defendant Joelle Gywnn ("Gwynn").  (*See* Callahan Decl. at ¶¶ 7, 9, ECF #14-3 at 3-4, Pg. ID 137-38; *see also* Compl. at ¶2, ECF #1 at 3, Pg. ID 3).  A second reporter at the Post, Danika Fears ("Fears"), also spoke with Gwynn. (*See* Fears

Decl. at ¶5, ECF #14-4 at 3, Pg. ID 154.)  The Post reporters asked Gwynn a series of questions via telephone, e-mail, and text message, and in response Gwynn provided information about her experience as a *Biggest Loser* contestant. (*See id.*; *see also* Callahan Decl. at ¶¶ 8-9, ECF #14-3 at 4, Pg. ID 138).  Gwynn supposedly told the reporters that an employee of the show gave her and other contestants "an illicit yellow and black pill" that made her feel "jittery and hyper." (Compl. at ¶24(f), ECF #1 at 9, Pg. ID 9.)  Gwynn said that she then told Dr. Huizenga about the pills, and he offered "some lame explanation of why they got added to our regimen and [said] that it was 'up to us to take [the pills].'" (*Id.*) According to Gwynn, her experience with the pills made her "feel" as if she had been "raped." (*Id.*)

Other former contestants apparently made similar statements to the Post's reporters.   They told the reporters that contestants had "passed out" in Dr. Huizenga's office before scheduled weigh-ins, that Dr. Huizenga knew contestants were using "illegal drugs to lose weight rapidly" and "never tried to stop it," and that Dr. Huizenga refused to help former contestants who re-gained weight after leaving the show. (*Id.* at ¶20, ECF #1 at 7-8, Pg. ID 7-8.)

On May 19, 2016, Callahan contacted a representative for Dr. Huizenga and sought a response to the statements made about him. (*See* Compl. at ¶20, ECF #1 at 7, Pg. ID 7.)  On May 20, 2016, an attorney for Dr. Huizenga informed Callahan

that all of the statements made about Dr. Huizenga were false. (*See id.* at ¶21, ECF #1 at 8, Pg. ID 8.)  Dr. Huizenga's counsel told Callahan that the statements "constitute[d] defamation" and, if published, would cause Dr. Huizenga "substantial damages." (*Id.*)

On May 22 and 23, 2016, the Post published three separate articles about *The Biggest Loser*. (*See* Callahan Decl. at ¶¶ 3-5, ECF #14-3 at 2-3, Pg. ID 137-38.)  The stories were available in both the print and digital editions of the Post and were also posted on the Post's website. (*See id.*)  The stories focused on the treatment of the contestants both during and after their appearances on *The Biggest Loser*.

The first article, published on May 22, "was by far the longest and most involved of the [a]rticles." (*Id.* at ¶6, ECF #14-3 at 3, Pg. ID 137.)  It appeared on the front page of the Post under the headline "'Biggest Loser Drugged Me[:]' New shock revelations behind show." (*See* ECF #18-4.)  Gwynn was also pictured on the front page wearing a *Biggest Loser* shirt. (*See id.*)  All three articles generally contended that show staffers provided drugs to contestants and encouraged contestants to lose weight in unsafe ways.  In addition, the stories contained specific statements about Dr. Huizenga, including that:

- he "urged contestants to take meds and go hungry;"

9

- the show "provid[ed] illicit drugs to contestants and [made them submit to] questionable medical exams by the show's resident doctor, Rob Huizenga;"

- he told some disfavored contestants to ingest baking soda (in the hope that they would not lose weight and thus be "eliminate[d]" from the show); and

- he "encouraged contestants to take street drugs while starving themselves and to lie about how much weight they were losing."

(Compl. at ¶24, ECF #1 at 9-10, Pg. ID 9-10.)  Two of the articles also included Gwynn's statement that Dr. Huizenga told her that it was "up to [her] to take" the illicit pill that the show's producers had given her. (*Id.* at ¶24(f), ECF #1 at 9, Pg. ID 9.)  The stories never mention the State of Michigan nor that Gwynn is a resident of Michigan. (*See* ECF ## 1-1, 1-2, and 1-3.)

## II

On June 2, 2016, Dr. Huizenga filed this action against the Post and Gwynn. (*See* Compl., ECF #1.)   His Complaint includes three counts brought jointly against the Defendants: libel, libel *per se*, and interference with business relationships and expectancies. (*See id.*)

According to Dr. Huizenga, the Post's stories about *The Biggest Loser* contained the "false and defamatory statements" quoted above. (*See id.*, ECF #1 at 2, Pg. ID 2.)  Dr. Huizenga insists that "[t]his lawsuit became necessary to protect [his] hard-earned reputation and stature in the medical community … which cannot

be allowed to be destroyed within seconds by Defendants' false statements." (*Id.* at 3, Pg. ID 3.)  Specifically, Dr. Huizenga contends that the articles harmed his relationships with his current patients, with potential patients, and with numerous television networks, including "ABC, NBC, Bravo, MTV, Oxygen, Spike TV, FOX, CW Network, Discovery Network, Univision, CBS, WE TV, KTLA, National Geographic, Netflix, and TLC." (*Id.* at ¶53, ECF #1 at 19, Pg. ID 19.)

On August 1, 2016, the Post moved to dismiss for lack of personal jurisdiction. (*See* ECF #14.)  The Post also moved, in the alternative and under 28 U.S.C. § 1404(a), to transfer this action to the United States District Court for the Central District of California (where Dr. Huizenga resides). (*See id.* at 26-29, ECF #14 at 37-40, Pg. ID 110-113.)  On August 2, 2016, Gwynn filed a "limited joinder," joining the Post's alterative request to transfer this action to California under 28 U.S.C. § 1404(a). (ECF #15.)

The Court held a hearing on the Motion to Dismiss on November 14, 2016.

## III

The Post brings the Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(2).  Under this rule, "[t]he plaintiff bears the burden of establishing through specific facts that personal jurisdiction exists over the non-resident defendant, and the plaintiff must make this demonstration by a preponderance of the evidence." *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir.

2012) (internal quotation marks omitted).  Where, as here, a court does not hold an evidentiary hearing, "the plaintiff need only make a *prima facie* case that the court has personal jurisdiction." *Id.* (internal quotation marks omitted).  The Court does "not weigh the facts disputed by the parties but instead consider[s] the pleadings in the light most favorable to the plaintiff." *Id.*  The Court may, however, "consider the defendant's undisputed factual assertions." *Id.*  "[A]lso where, as here, ... there does not appear to be any real dispute over the facts relating to jurisdiction, the *prima facie* proposition loses some of its significance." *Id.* (internal quotation marks omitted).

## IV

## A

Personal jurisdiction may be either general or specific.  *See Air Products and Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549-50 (6th Cir. 2007).  General jurisdiction "depends on continuous and systematic contact with the forum state," whereas specific jurisdiction "grants jurisdiction only to the extent that a claim arises out of or relates to a defendant's contacts in the forum state."  *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 679 (6th Cir. 2012) (citing *Kerry Steel, Inc. v.*

*Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997)).  Dr. Huizenga contends

primarily that the Court has specific jurisdiction over the Post.[2]

In order to for a court to exercise specific personal jurisdiction over a

defendant in a diversity case, "the defendant must be amenable to suit under the

forum state's long-arm statute and the due process requirements of the Constitution

must be met." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).

---

[2] Dr. Huizenga briefly argues in a footnote that the Court may exercise general jurisdiction over the Post pursuant to M.C.L. § 600.711. (*See* Dr. Huizenga Br. at 16-17 n.6, ECF #18 at 25-26, Pg. ID 202-03.)  That statute provides that general jurisdiction over a defendant exists where the defendant carries on "a continuous and systematic part of its general business within the state." M.C.L. § 600.711(3). Dr. Huizenga insists that the statute is satisfied because "the Post's Michigan customers include [] millions of Michigan [visitors] per month [to the Post's website]." (Dr. Huizenga Br. at 17 n.6, ECF #18 at 26, Pg. ID 203.)  But the Sixth Circuit has expressly rejected the proposition that the maintenance of a "website that is accessible to anyone over the Internet is []sufficient to justify general jurisdiction." *Bird v. Parsons*, 289 F.3d 865, 874 (6th Cir. 2002). *See also E & M Properties, Inc. v. Razorgator, Inc.*, 2008 WL 1837261, at *3 (E.D. Mich. 2008) (same).  Dr. Huizenga further contends that general personal jurisdiction exists over the Post because it "gets revenues from numerous Michigan mail and digital subscribers." (Dr. Huizenga Br. at 17 n.6, ECF #18 at 26, Pg. ID 203.)  But he has not cited any case in which a court has deemed a publisher subject to general personal jurisdiction in a forum in which it sold the small number of copies that the Post sells here.  More importantly, under M.C.L. § 600.711(3), "[a] foreign corporation must actually be present within the forum state on a regular basis, either personally or through an independent agent, in order to be subjected to general personal jurisdiction" in Michigan. *Kircos v. Lola Cars, Ltd.*, 296 N.W.2d 32, 35 (Mich. Ct. App. 1980); *see also Children's Legal Serv. v. Shor Levin and Derrita, P.C.*, 850 F.Supp.2d 673, 680 (E.D. Mich. 2012) (same).  And here, it is undisputed that the Post has no such presence in Michigan. (*See* Racano Decl. at ¶¶ 5-6, ECF #14-2 at 3, Pg. ID 119.)  Dr. Huizenga has not persuaded the Court that the Post maintains the kind of continuous and systematic contacts with the State of Michigan that would subject the Post to general personal jurisdiction here.

Here, because "Michigan's long-arm statute extends to the limits imposed by federal constitutional due process requirements … the two questions become one." *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016).  Thus, the Court must only "determine whether the exercise of personal jurisdiction over [the Post] comports with constitutional due process." *Id.*

Constitutional due process requirements are satisfied when an out-of-state defendant has "minimum contacts" with the forum state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (internal citations omitted).  In *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374 (6th Cir. 1968), the Sixth Circuit established a three-part test to guide this determination:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.* at 381.  For the reasons explained below, the Court concludes that Dr. Huizenga has failed to satisfy this test.

14

**B**

**1**

"Purposeful availment … is present where the defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum State[] and where the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 889 (6th Cir. 2002) (internal citation and punctuation omitted; emphasis added). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1980). "In the Sixth Circuit, the emphasis in the purposeful availment inquiry is whether the defendant has engaged in some overt actions connecting the defendant with the forum state." *Fortis Corporate Ins. v. Viken Ship Mgmt.*, 450 F.3d 214, 218 (6th Cir. 2006) (citations and quotation marks omitted).

There is reason to believe that the Post purposefully availed itself of the privilege of doing business in Michigan. Indeed, purposeful availment exists where a defendant manifests its intent to maintain "continuing relationships and obligations" within a forum state, *Burger King*, 471 U.S. at 476, and that is

15

arguably what the Post did when it "chose to contract with [ten or more] customers from Michigan" for delivery of the Post's print edition via U.S. mail. *Neogen*, 282 F.3d at 892 (finding purposeful availment where defendant contracted with roughly fifteen Michigan residents per year).   Even though the Post's subscription agreements with Michigan residents constitute an "insignificant percentage of" the Post's overall customer relationships, these contracts may amount to purposeful availment because they allowed the Post to conduct "predictable yearly business" in this forum. *Id.* at 891-92 (holding that roughly fifteen transactions per year with Michigan residents is "predictable yearly business" in this forum, is not a random or fortuitous connection, and thus amounts to purposeful availment).   As the United States Court of Appeals for the Ninth Circuit has concluded, "mailing to regular subscribers, even though few," may amount to purposeful availment because such mailing "is not random or fortuitous and is not even necessarily isolated." *Gordy v. Daily News, L.P.*, 95 F.3d 829 (9th Cir. 1996).[3]

---

[3] In *Gordy*, the Ninth Circuit held that an out-of-state publication was subject to personal jurisdiction under the so-called "effects test" recognized by the United States Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984). *See Gordy*, 95 F.3d at 832 (explaining that *Calder* is the "closest case to the present one").   As explained below in section IV(C), the *Calder* "effects test" differs from the traditional personal jurisdiction analysis set forth above.   But the referenced quote from the Ninth Circuit is nonetheless relevant here because the court made that statement in response to the publication's argument that its small circulation in California was "random, isolated, or fortuitous." *Id.* at 833-34.

But there is also some force to the argument that the Post's small number of subscription agreements with Michigan residents falls short of purposeful availment because – since the Post does not solicit subscriptions here – those agreements did not "proximately result from [Michigan-directed] actions by" the Post. *Burger King*, 471 U.S. at 475.  And the Post's limited number of print subscription agreements with Michigan readers (ten) could, perhaps, reasonably be viewed as "isolated" connections to Michigan, and, thus, insufficient to constitute purposeful availment of this forum. *See Pickens v. Hess*, 573 F.2d 380, 385 (6th Cir. 1978) (explaining that "isolated acts of [a] defendant" do not constitute sufficient "minimum contacts" to support assertion of personal jurisdiction). Moreover, even if the Court were to consider the amount of *both* print subscribers *and* readers who receive the Post's digital edition from third-party providers in Michigan – approximately 237 readers – such a low level of circulation may be too attenuated a connection to this forum to constitute purposeful availment.  As the United States Court of Appeals for the First Circuit has explained, while "widespread circulation of a publication indicates deliberate action, thin distribution may indicate a lack of purposeful contact" within a forum. *Noonan v. Winston Co.*, 135 F.3d 85, 91 (1st Cir. 1998).

In the end, "[w]hether [the Post's] contacts with Michigan are sufficient to satisfy the 'purposeful availment' requirement is not clear." *Beydoun v. Watanyia*

17

*Restaurants Holding, Q.S.C.*, 768 F.3d 499, 506 (6th Cir. 2014).  But the Court "need not decide" that thorny question because, as explained below, the third prong of the *Southern Machine* test – whether the assertion of personal jurisdiction would be reasonable – is not satisfied.  *Id*. (declining to decide purposeful availment question where plaintiffs "failed to satisfy the other two prongs" of the *Southern Machine* test).[4]

**2**

While the purposeful availment question here is a difficult one, the analysis of under second prong of the *Southern Machine* test – whether "the cause of action arise from the defendant's activities" in the forum state, *Southern Machine*, 401 F.2d at 381 – is much more straightforward, and that prong is easily satisfied.  A cause of action arises from the defendant's contacts with the forum when it has "a substantial connection with the defendant's in-state activities." *Dean v. Motel 6*

---

[4] Dr. Huizenga insists that when analyzing the purposeful availment question, the Court should also consider the number of Michigan residents who visit the Post's website. (*See*, *e.g.*, Dr. Huizenga Resp. Br. at 4-5, ECF #18 at 13-14, Pg. ID 190-91.)  Dr. Huizenga argues that these website visits are relevant to purposeful availment under *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).  In that case, the United States District Court for the Western District of Pennsylvania developed a sliding scale to assist in the assessment of whether a defendant's operation of a website amounts to purposeful availment. *See Zippo Mfg. Co.*, 952 F. Supp. at 1124.  The Sixth Circuit has applied that scale in assessing purpose availament. *See Neogen*, 282 F.3d at 890.  Because the Court is not definitively ruling on the purposeful availment question, and because the Court would decline to assert personal jurisdiction over the Post even if the Post had purposefully availed itself of the privilege of doing business in Michigan, the Court need not undertake a *Zippo* analysis of the Post's website.

*Operating, L.P.*, 134 F.3d 1269, 1275 (6th Cir. 1998) (quotation marks omitted). Dr. Huizenga alleges just such a connection.  He alleges that on three separate occasions, the Post sent libelous articles about him to its Michigan print subscribers.  Quite simply, he alleges that the Post libeled him *in Michigan*, and his claims seek recovery for, among other things, injuries that he suffered here.  Dr. Huizenga's libel claim thus arises out of the Post's contacts with this forum.

**3**

Dr. Huizenga has failed to satisfy the third prong of the *Southern Machine* test because he has not shown that the Post has a "substantial enough connection with [Michigan] to make the exercise of jurisdiction … reasonable." *Southern Machine*, 401 F.2d at 381.  "This [third] requirement exists because minimum requirements inherent in the concept of fair play and substantial justice may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities."  *Air Products and Controls*, 503 F.3d at 554 (internal quotation marks omitted).  That is true here.

"Generally, when considering whether it is reasonable to exercise personal jurisdiction over a non-resident defendant, a court must consider several factors including the following: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy." *Intera Corp.*

*v. Henderson*, 428 F.3d 605, 618 (6th Cir. 2005). While these four factors are important guides (which the Court applies below), in a libel/defamation case against a publication, the reasonableness analysis "must start with *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770 (1984)." *Basile v. Prometheus Global Media, LLC*, 2016 WL 2987004, at *3 (N.D. Ill. May 24, 2016).

In *Keeton*, a New York plaintiff brought a defamation action in a New Hampshire court against Hustler Magazine, Inc. ("Hustler"), an Ohio corporation that had its principal place of business in California. The Supreme Court held that Hustler was subject to personal jurisdiction in New Hampshire because it regularly sold "thousands of magazines" – between 10,000-15,000 per month – in that state. *Keeton*, 465 U.S. at 774. The court found it reasonable to subject Hustler to personal jurisdiction in New Hampshire given that the magazine had a national focus and was widely sold in New Hampshire:

> Where, as in this case, respondent Hustler Magazine, Inc., has continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine. And, since respondent can be charged with knowledge of the 'single publication rule,' it must anticipate that such a suit will seek nationwide damages. Respondent produces a national publication aimed at a nationwide audience. *There is no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed.*

*Id.* at 781 (internal citation omitted; emphasis added).

The Courts of Appeals have uniformly concluded that "*Keeton* jurisdiction demands *substantial* circulation," *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 425 (5th Cir. 2005) (emphasis added), and they have consistently rejected efforts to assert personal jurisdiction over libel defendants in forums where their circulation falls well below the 10,000-15,000 copies that Hustler distributed in *Keeton*.  For instance, in *Fielding,* the United States Court of Appeals for the Fifth Circuit held that *Keeton* jurisdiction was "lacking" over two magazine publishers who distributed sixty and seventy issues per week, respectively, in the forum. *Id.* Likewise, in *Chaiken v. VV Pub. Corp*., 119 F.3d 1018, 1029 (2d Cir. 1997), the United States Court of Appeals for the Second Circuit held under *Keeton* that a libel defendant's circulation of 183 issues per week did not "constitute the 'substantial number of copies' that ma[de] it fair to exercise jurisdiction over [the] non-resident publisher."  Finally, in *Noonan*, *supra*, the United States Court of Appeals for the First Circuit said that a publisher's circulation of 305 magazines in the forum state was not "sufficient to support jurisdiction" under *Keeton*.  *Noonan*, 135 F.3d at 91.

Here, the Post's circulation in Michigan falls far below *Keeton's* substantiality requirement.  The Post has only ten print subscribers in Michigan, and approximately 227 additional Michigan residents purchase a digital edition of the Post from third party providers.  This entry into the Michigan market is *de*

21

*minimis* and closely resembles the publication levels deemed insufficient to satisfy Keeton's fairness threshold in *Fielding*, *Chaiken*, and *Noonan*. *See also Scherr v. Abrahams*, 1998 WL 299678 (N.D. Ill. May 29, 1998) (holding that sixty subscribers did not satisfy *Keeton's* requirement of substantial circulation).

Dr. Huizenga has not cited a single case in which any federal court has held that *Keeton* permits the assertion of personal jurisdiction over a publication with the small number of subscribers and/or sales in the forum state that the Post has here. When asked during the hearing to identify the most similar case in which a court has found the assertion of personal jurisdiction over an out-of-state publication to be reasonable, counsel for Dr. Huizenga identified *Keeton*, itself. Counsel further implied that the case for asserting personal jurisdiction over the Post here is actually stronger than the case for jurisdiction over Hustler in *Keeton* because the Post's articles arose, in part, from its contact with a Michigan resident (Gwynn).

The Court does not share Dr. Huizenga's view of *Keeton*. That decision is materially distinguishable. Hustler sold its magazine to at least 10,000 readers in New Hampshire; the Post is sold to less than 250 subscribers in Michigan.[5] And

---

[5] One could argue that because the Supreme Court in *Keeton* considered the number of Hustler copies sold in New Hampshire each month, this Court should likewise tally up the number of copies of the Post sold in Michigan each month. That number would be roughly 7,000 (10 print editions each day and 227 digital editions each day), and it would begin to approach the 10,000 copies per month

the Supreme Court in *Keeton* added that Hustler's status as a "national publication aimed at a nationwide audience" made it reasonable to require Hustler "to answer for the contents of [its] publication wherever a substantial number of copies are regularly sold and distributed." *Keeton*, 465 U.S. at 781.  The Post, in contrast, is not a national publication.[6]  It covers subjects that "appeal to the Post's primarily New York-based readership." (Racano Decl. at ¶7, ECF #14-2 at 2, Pg. ID 119.)

---

that the Supreme Court found sufficient to support jurisdiction in *Keeton*. But this Court does not read *Keeton* as rigidly requiring lower courts to use copies-per-month as the relevant metric.  The Supreme Court in *Keeton* used the monthly sales figure because Hustler was a monthly publication, and in that circumstance, the number of copies sold per month was a fair proxy for Hustler's intentional penetration into the New Hampshire market.  Here, in contrast, the Post is a daily publication, and the more relevant metric for measuring the Post's intentional penetration into the Michigan market is the number of copies sold per day. Finally, the Court declines Dr. Huizenga's invitation to consider as part of its *Keeton* reasonableness analysis the number of visits to the Post's website by Michigan residents.  *Keeton* is focused on the extent to which the defendant publication intentionally enters the forum market, and the Post does not intentionally enter the Michigan market when Michigan residents visit its web page.  Dr. Huizenga has not cited any case in which any court has considered page views from a website as part of a *Keeton* analysis.

[6] The decision in *Basile, supra*, illustrates the important role that a publication's target audience may play in the *Keeton* reasonableness analysis.  The Illinois federal court in *Basile* held that *Keeton* permitted the assertion of personal jurisdiction over a California publisher that distributed 1,300 copies of an allegedly-libelous article in Illinois.  The court stressed that it could reasonably assert jurisdiction over the publisher because the publisher touted its efforts to reach "industry moguls, A-list celebrities and consumer[s] influential *in metropolitan areas from coast to coast*." *Basile*, 2016 WL 2987004 at *4 and n. 1 (emphasis added).  The court deemed the assertion of jurisdiction to be a reasonable "quid pro quo" for the publisher's intentional targeting of influential readers *in Chicago*. *Id.* at *4.  Here, the Post's target audience is not in Michigan, and the Post nowhere touts its successful entry into the Michigan market.

Finally, that the Post obtained information from Gwynn does not make the assertion of jurisdiction over the Post any more reasonable under *Keeton*. Nothing in *Keeton* suggests that a publication subjects itself to personal jurisdiction in a forum in which it has *de minimis* circulation by gathering information from a source in that forum. And here, Gwynn's Michigan residence adds nothing to the reasonableness analysis because it is fortuitous. The Post did not contact Gwynn because she resided here, and, indeed, her state of residence was immaterial to the Post. Simply put, the Post could not reasonably anticipate being haled into a Michigan court on the ground that it spoke to a source who happened to live in Michigan. *Keeton* does not support the assertion of personal jurisdiction over the Post.

In addition to failing to satisfy *Keeton's* reasonableness standard, Dr. Huizenga has failed to show that the assertion of jurisdiction over the Post would be reasonable under the Sixth Circuit's four-part test set forth above.[7] Indeed, the

---

[7] The Court recognizes that where the first two prongs of the *Southern Machine* test are satisfied, "an inference arises" that it would be reasonable to assert personal jurisdiction over the defendant. *See CompuServe*, 89 F.3d at 1268. Because this Court has not found that the Post purposefully availed itself of the privilege of doing business in Michigan, the inference of reasonableness does not arise. But even if this inference arose, the Court would still find the assertion of personal jurisdiction over the Post to be unreasonable – both because the *Keeton* reasonableness test is not satisfied and because the four reasonableness factors applied above weigh heavily against the assertion of personal jurisdiction.

balance of these factors weigh *against* a finding that it would be reasonable to subject the Post to personal jurisdiction here.

First, litigating in Michigan would impose a meaningful burden on the Post. It has no offices and no employees here. (*See* Racano Decl. at ¶5, ECF #14-2 at 3, Pg. ID 119.) Its lead counsel is not here. The bulk of its evidence and witnesses are not here. And its home base is several hundred miles away. For these reasons, it would be inconvenient, costly, and inefficient for the Post to litigate here, and those burdens weigh against a finding of reasonableness.[8] *See Intera Corp.*, 428 F.3d at 618 (holding that defendant "would be substantially burdened" if forced to litigate in a state in which he did not reside).

---

[8] The obvious question here is: how can the Court find that litigating in Michigan would impose a substantial burden on the Post in light of the fact that the Post has asked the Court, as an alternative to dismissal, to transfer the case *to California*? Stated another way: Isn't the Post's willingness to litigate this dispute in the United States District Court for the Central District of California – which is over 2,000 miles further from its home base than is this Court – a clear indication that litigating here would not unduly burden the Post? There are two answers to these questions. First (and most importantly), the Post's request to transfer this case to California is *not* an admission that litigating in California would not be burdensome. Rather, it is an acknowledgement that under *Calder*, *supra*, the Post could reasonably be required to bear the burdens of litigating in California because, among other things, the Post's stories concerned the California activities of a California resident; allegedly injured that California resident in his home state; and were arguably aimed, at least to some extent, toward California. (*See* discussion of *Calder*, *infra* at Section IV(C)). Second, although California is further from New York than Michigan, there appears to be a substantial likelihood that much of the relevant evidence and many of the key witnesses are located in California, and the proximity of those witnesses and location of that evidence, at least in some respects, makes California a more convenient (and less burdensome) forum for the Post.

25

Second, while Michigan may have some interest in adjudicating Dr. Huizenga's claims, it is not an especially strong interest. For instance, Michigan may have an interest in protecting non-residents from reputational harm here, *see Keeton*, 465 U.S. at 776-77, but Dr. Huizenga's reputation is centered in California and that is where he suffered the "brunt" of his alleged injuries. *See Calder*, 465 U.S. at 789. Likewise, Michigan may have an interest in protecting its citizens from being misled by libelous falsehoods, *see Keeton*, 465 U.S. at 776, but the Post directed the allegedly-false statements to a very small number of Michigan residents. On balance, this factor weighs slightly in favor of a finding of reasonableness.

Third, Dr. Huizenga has not shown that his interest in obtaining relief in Michigan weighs in favor of asserting jurisdiction over the Post here. If this Court were to decline to assert jurisdiction over the Post, Dr. Huizenga could sue the Post *in his home state and his home town*. Dr. Huizenga has not persuaded the Court that a federal court in California is any less capable than this Court of awarding any and all relief to which he may be entitled. This factor weighs against a conclusion that asserting personal jurisdiction over the Post here is reasonable.

Finally, California has a far stronger interest than Michigan in resolving the controversy between the Post and Dr. Huizenga because the primary alleged injuries suffered by Dr. Huizenga occurred in California. Indeed, Dr. Huizenga

26

claims that he suffered serious reputational damage with numerous key players in the entertainment industry, and California is widely recognized as the "center" of that industry. *Sinatra v. National Enquirer, Inc*., 854 F.2d 119, 1202 (9th Cir. 1988).  Likewise, he claims that the Post injured his relationship with current and potential patients whom he treats or would treat at his clinic in California.  This final factor supports a finding that asserting personal jurisdiction over the Post here would be unreasonable.

When the Court balances each of the four reasonableness factors, it concludes that asserting personal jurisdiction over the Post would be unreasonable. For that reason and because the assertion of personal jurisdiction over the Post would be unreasonable under *Keeton,* this Court must dismiss Dr. Huizenga's claims against the Post.

## C

Dr. Huizenga briefly argues in a footnote that even if the Post is not subject to personal jurisdiction under the *Keeton* reasonableness standard, it is subject to personal jurisdiction under the so-called "effects test" adopted by the Supreme Court in *Calder*, *supra*. (*See* Dr. Huizenga Br. at 15-16 n. 5, ECF #18 at 24-25, Pg. ID 201-02.)  The Court disagrees.

In *Calder*, the actress Shirley Jones, a California resident, sued the writers and editors of *The National Enquirer* magazine, who were Florida residents, for

libel in a California court.  The Supreme Court concluded that the California court had personal jurisdiction over the Florida-based defendants.   It reached this conclusion because, among other things,

> [t]he allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California.  The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the "effects" of their Florida conduct in California.

*Calder*, 465 U.S at 788-89.

"The Sixth Circuit, as well as other circuits, have narrowed the application of the *Calder* 'effects test.'" *Air Products and Controls*, 503 F.3d at 552 (citing cases).   When applying *Calder*, the Sixth Circuit focuses on whether "the defendant 'expressly aimed' tortious conduct at the forum in question and the 'brunt of the harm' is felt there." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 451 (6th Cir. 2012).

Dr. Huizenga has not satisfied either of these requirements.  The Post did not "expressly aim" its stories at this forum.  While its stories did include quotes from Gwynn, a Michigan resident, the stories never mention the State of Michigan, and they did not concern any actions by Dr. Huizenga in Michigan. Nor did Dr.

Huizenga suffer the "the brunt" of his alleged harm here.  As described above, Dr.
Huizenga is a Los Angeles-based physician who, in addition to running a weight-
loss clinic in southern California, acts as a consultant to multiple television shows
and movies that are based in California.  He has not shown that his reputation or
"career [is] centered" in this state. *Calder*, 465 U.S at 788-89.   Under these
circumstances, *Calder* does not permit the Court to assert personal jurisdiction
over the Post. *See*, *e.g.*, *Reynolds v. International Amateur Athletic Federation*, 23
F.3d 1110, 1120 (6th Cir. 1994) (declining to exercise jurisdiction based on *Calder*
effects test where allegedly defamatory press release concerned conduct outside
the forum state, the plaintiff's reputation was centered outside of the forum state,
and the forum state was not the focal point of the press release); *Cadle Company v.
Schlichtmann*, 123 Fed. App'x 675, 679 (6th Cir. 2005) (declining to exercise
jurisdiction under *Calder* where publication "did not concern … [forum state]
activities" and was not "directed at [forum state] readers, as opposed to the
residents of other states"); *Revell v. Lidov*, 317 F.3d 467, 473 (5th Cir. 2002)
(declining to exercise jurisdiction and finding *Calder* distinguishable because
allegedly defamatory article "contain[ed] no reference to [the forum state], nor
[did] it refer to the [forum state] activities of [the plaintiff], and it was not directed
at [forum state] readers as distinguished from readers in other states").

**V**

Because the Court has concluded that it lacks personal jurisdiction over the Post, it cannot address the Post's alternative request to transfer this action to the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1404(a). *See Pittock v. Otis Elevator Company*, 8 F.3d 325, 329 (6th Cir. 1993) ("[A] transfer under section 1404(a) may not be granted when the district court does not have personal jurisdiction over [a] defendant[]"). Likewise, the Court declines to rule on Gwynn's joinder in that request. (*See* ECF #15.)

**VI**

For the reasons stated above, **IT IS HEREBY ORDERED** that the Post's Motion to Dismiss (ECF #14) is **GRANTED**. All claims Dr. Huizenga has brought against the Post are **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated: December 21, 2016        UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 21, 2016, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113

30